Filed 6/13/23 P. v. Hawkyard CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Placer)

----

| | |
|---|---|
| THE PEOPLE, | C094270 |
| Plaintiff and Respondent, | (Super. Ct. No. 62-172747) |
| v. | |
| WILLIAM ROBERT HAWKYARD, | |
| Defendant and Appellant. | |

Defendant William Robert Hawkyard appeals from his convictions of committing lewd acts on a minor, contacting or communicating with a minor with the intent to commit a lewd act (luring), and possessing heroin. (Pen. Code, §§ 288, subd. (c)(1); 288.3, subd. (a); Health & Saf. Code, § 11350, subd. (a); statutory section citations that follow are found in the Penal Code unless otherwise stated.)

Defendant contends (1) insufficient evidence supports the luring count, specifically whether defendant knew or should have known that the victim was a minor;

1

(2) defense counsel rendered ineffective assistance by not requesting a pinpoint jury instruction on the mistake of fact defense to the luring count; (3) the trial court erred in excluding evidence that supported defendant's mistake of fact defense; and (4) cumulative error. Defendant also raises sentencing error, contending we must reverse and remand his sentence for further proceedings pursuant to Senate Bill No. 567 and Assembly Bill No. 124, and because the trial court violated section 654 by not staying one of the lewd act counts or the luring count, as both were part of the same course of conduct.

Except to remand for resentencing under the recent legislation, we affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

The victim, Jane Doe, was born in August 2005. In April 2020, 14-year-old Jane was a high school freshman. She lived in Sacramento County near Elk Grove with her father Stephan F., Stephan's wife, and Jane's siblings. Stephan's mother, Alice F., lived nearby. Jane's mother, Jessica P., lived in the Natomas area. Jane had lived with her mother before she moved to her father's home when she was 12.

Prior to April 2020, Jane had her own cell phone but only at school for communication purposes. In April, due to the coronavirus pandemic, she began attending school remotely from home. As a result, Stephan took away her phone. He did not want her accessing social media. He did not approve of any kind of social media at her age.

On the night of April 25, 2020, Jane stayed at her grandmother Alice's house along with other cousins and relatives. When her grandchildren slept over at her house, Alice required them to give her their cell phones. She also did not allow them to use the Wi-Fi, computers, and tablets. Alice had a cell phone and a land line with three cordless headsets. She allowed her grandchildren to use her house phone only to call their parents, and then only with her permission.

2

Around 1:30 a.m. April 26, 2020, Alice's house phone rang, and Alice answered it. A male asked to speak with Jane. Alice went to the living room where Jane was sleeping and asked Jane who was calling her. Jane said she did not know. Alice said, "Hello," into the phone but no one responded. Alice went back to bed.

Jane testified that when everyone went to sleep, she left the house, hopped the fence, and went across the street. She waited in a neighbor's driveway until a Lyft arrived. The Lyft driver took her to defendant's house. She arrived there at around 2:00 a.m.

At Alice's house on the morning of April 26, family members looked for Jane. Alice's house phone had caller ID, and it showed an incoming call around 1:30 a.m. from "Montez, John." The phone number matched a number listed as the last call made from the phone. Evidence at trial established that the phone number in John Montez's name belonged to defendant's phone.

Jane's father Stephan called defendant's phone number multiple times on April 26. The first time he called, someone picked up the call and hung up. Stephan left voicemails stating he just wanted to talk to Jane and to let him know if she was not there. He also sent texts to defendant's phone asking who it was and stating that Jane was only 14 and to bring her home. At 11:47 a.m., he texted, "Just come home kiddo. It's only me here. We can talk." He texted his final message at 6:38 p.m., stating, "She's only 14. She's a little girl." He never received a return call or message.

Stephan's sister Stacey called defendant's phone number multiple times on April 26. Stacey used Alice's house phone, but that was blocked before noon after a few calls. She called defendant 237 times from her own cell phone and many times from other phones. She left about 30 voice mail messages. In the messages, she stated that Jane was 14 years old and underage. She also stated they did not want any trouble; they just wanted to get Jane back.

3

After police were summoned to Alice's house that day, an officer with the Sacramento County Sheriff's Department called defendant's phone, and no one answered. The officer left a voice mail stating she was calling about the missing person's report she had taken on Jane, and she requested a call back. No one returned the call.

On April 28, 2020, a detective looking at Alice's phone history found that Alice received a phone call from defendant's phone at approximately 1:57 a.m. on April 26. He also found other calls were made from defendant's phone number to Alice's phone over the previous couple of weekends when Jane had stayed at Alice's house.

Later that day, law enforcement officers entered defendant's house in Loomis. They saw defendant and Jane naked and walking out of the bathroom after taking a shower. Officers also found a plastic baggie containing heroin on a nightstand in defendant's bedroom. DNA found on vaginal swabs taken from Jane matched defendant's DNA profile.

Jane's trial testimony

Jane first met defendant on Bumble, an online dating app for adults. Even though she was a minor, she was able to create an account for the site. On Bumble, a woman must message a man first. A man cannot message a woman; he must wait for a woman to contact him. Jane testified that when she first met defendant, he asked her how old she was. She said she was 18.

After meeting on Bumble, Jane and defendant communicated through Snapchat. Snapchat is a social media app commonly used by younger people to communicate with others and send pictures and short videos. Videos and pictures sent through Snapchat can be set to delete.

For a while, Jane had her own cell phone and used it to speak and communicate with defendant, including via Snapchat. She broke it because she got mad. After that, she used her grandmother's house phone to speak with defendant and exchange instant

4

messages. She also accessed social media with her friends' cell phones after her family confiscated her own.

Jane testified that in her Snapchat messages with defendant, she said things about herself that were not true. She said she worked at Panera Bread, but she did not. She stated her family wanted her to sell drugs and that they were involved in gang activity. But it was only her mother's side of the family that participated in gang activity and wanted her to sell drugs, not her father's side.

In one of her Snapchat messages, Jane said she wanted to be an oceanographer. She was trying to prove to defendant that she was older by saying she wanted to go to San Diego State. In another message, she told defendant she was 18 years old and a senior in high school. In fact, she was a freshman. Also through Snapchat, Jane sent photos and videos to defendant of herself topless and of her vagina. We will set forth the Snapchat messages in detail below.

Jane testified she called defendant the night of April 25, 2020, because she was ready to leave her father's house to be with defendant. She was tired of being with her father's side of the family because she was different from everyone else. She and defendant decided they would meet at defendant's house, and Jane would get there via Lyft. Defendant would order the Lyft for her. That night, she put her bags by the side gate. As already stated, Jane left Alice's house once everyone was asleep. A Lyft took her to defendant's house.

Once Jane was inside defendant's house, defendant took her to his bedroom. He told Jane his mother lived in the house, and Jane was to stay in his bedroom until his mother left. The first night Jane was there, she and defendant touched each other's genitals and had sexual intercourse.

While Jane was with defendant, she saw him using a cell phone. She saw calls and text messages coming into the phone from her family. She did not listen to any of the voicemails. Defendant told her that her "people" were calling. Jane could not

5

remember at trial if he asked why they were calling. Jane told defendant not to answer his phone when they called. She hung up his phone at least one time. She read some of the text messages from her family, but she decided not to respond to them and told defendant not to respond to them.

Jane had sex with defendant more than three times. They also engaged in oral sex. The two had sex right before law enforcement came to pick her up. She had just got out of the shower and was naked when they arrived.

Defendant would say little things to her where she felt he was asking about her age, but she brushed them off. Defendant never really asked anything that would show how old she was. He videotaped her while asking how old she was when she was "half asleep."

Jane testified that defendant made her feel pretty and good about herself when they were together. She cared about him a lot and still did as of the time of trial.

Police interview of defendant

Detectives interviewed defendant at his home the day of the arrest. During the interview, defendant said he met Jane on Bumble and that she was 18 years old. The morning of his arrest, Jane told him she was 18. He told her it was a little odd she did not have identification on her. He asked her for her name and date of birth and then videotaped her response because he had a weird feeling.

During the interview, detectives asked defendant if he and Jane had sex. Defendant said they did not. He repeated she told him she was 18. A detective said, "So, she's 18. Did you guys have sex?" Defendant said they did not, and then asked, "[I]s this a trick question? Is she 18? 'Cuz we're not . . . I don't think you're tellin' me the truth here. I don't think she's 18. I don't think you guys would be here if she wasn't. [¶] . . . [¶] [Y]ou said, 'Yes, she is 18,' Then you asked me again, 'Did you have sex.' I'm payin' attention. So, basically, I think you are lying to me. I don't think she's 18."

6

Defendant then asked the detective if Jane was 18. The detective said she was not. Defendant said Jane told him she was 18, and the detective said that Jane had told him she said that. Defendant continued to deny he and Jane had sex or oral sex. He said he did not know Jane was underage.

While defendant sat in the back seat of the patrol car, the computer-aided dispatch log on a computer screen in the car showed that the call for service was for a child molest, but it did not mention the victim's age. Defendant said to the detectives, "I saw that there was a rape and – and – and, uh, molestation on a computer inside your vehicle, so I'm not dumb. I understand that – well, what's going on here? I didn't know that she was not 18. I would not have brought her to my house, bro. I get plenty of bitches. I'm not worried about no fuckin' 14-year-old girl, understand that." Defendant said he had no reason to think Jane was lying to him. She had a grown-woman's body and said she was 18 and finishing high school.

At trial, one of the interviewing detectives testified that when he listened to the recorded interview of defendant, he heard defendant say that Jane was 14. The detective had not told defendant Jane's true age prior to defendant's statement.

### Cell phone evidence

Officers recovered defendant's cell phone at his house. The contact name "never answer" had been assigned to Alice's phone number in defendant's phone on April 25, 2020. Nineteen phone calls were exchanged between defendant's phone and Alice's phone from April 25 through April 28, 2020. Alice's phone called defendant's phone on April 25 at 3:18 p.m., 4:00 p.m., and 11:39 p.m. Defendant's phone called Alice's phone for a two-second call on April 26 at 12:03 a.m. Alice's phone called defendant's phone on April 26 at 12:03 a.m. for a four minute, 15 second call. Alice's phone also called defendant's phone on April 26 at 1:20 a.m., 1:21 a.m., and 1:22 a.m., but those calls were not answered.

Alice's phone made three additional short calls to defendant's phone that morning at 1:38 a.m., 1:42 a.m., and 1:46 a.m. Then defendant's phone called Alice's phone at 1:59 a.m. April 26 for a 21 second call. The next calls from Alice's phone to defendant's phone began at 8:40 a.m. that morning.

From April 25 to April 28, 2020, a total of 331 calls were made to and from defendant's phone. Hundreds of those calls from Jane's family went unanswered.

Three instant messages were exchanged between defendant's phone and Alice's phone on April 26 regarding the Lyft's arrival. The first at 1:37 a.m. was from defendant's phone and stated, "They're outside." The next message at 1:40 a.m. was from defendant's phone and stated, "I told him three to five mins." "He just said okay." The third message was sent at 1:51 a.m. from defendant's phone and read, "It's five mins." "Silver Nissan."

A video on defendant's phone depicted the person who was filming the video touching Jane's naked buttocks and exposing her perineum and vaginal area. The video's metadata indicated the video was created on April 26, 2020, at 11:30 p.m.

Another video on defendant's phone depicted defendant asking Jane how old she was, and her answering she was 18 years old. Defendant then asked Jane repeatedly, "Can you give me your full name for the record?" Metadata indicated the video was created on April 28, 2020, at 11:05 a.m.

Snapchat messages

The information alleged the unlawful communications happened from February 24 to April 26, 2020. Snapchat records contained 303 messages exchanged between defendant and Jane from February 24 to April 21, 2020. We recite them in relevant part with their original punctuation, capitalization, and spelling.

On February 24, 2020, Jane wrote to defendant, "I mean after high school over the summer I'm going back to San Diego and going to SDSU for my softball training and

8

I'm going to try and go to SDSU for oceanography" Jane continued, "that's cool and the only reason why I have big plans is because my parents never really taught me things it was like always, 'beat her ass and sell this and do that and get a hood [n-word]' because my family bangs norte so I never really grew up to really know what to do but now I'm here and I'm building it higher for myself and to show people no matter how hard life was or is u can always find a way to make it better"

The next day, February 25, defendant wrote, "I wanna video chat u today" That night, Jane gave him a phone number. The following evening, February 26, Jane wrote, "Honestly I wanna be able to make u happy I never really got to" Defendant responded, "How do you plan on makin me so happy boo?" She wrote, "Just keeping it real baby" He replied, "You wanna make me happy? Support my dreams and plans and come make these bands with me" At this point, Jane forwarded to him pictures and videos of her touching her exposed breasts and of her hands touching her exposed vagina.

The February 26 messages then continued as follows:

Defendant: "You givin all that to me to own?"

Jane: "If u gonna treat me good it's yours"

D: "I don't share"

J: "I don't either"

D: "If you give that [to] me" "Then we rockin in every aspect of life." "Spiritually mentally physically financially." "So make sure this is what you want." "It's a choice." "Its not just gonna be sex."

J: "I like u a lot u make me feel good about myself"

D: "Im always gonna make sure you feel as gorgeous as you look. If you ready tell me daddy I'm yours."

J: "DADDY IM YOURS"

D. "We rocking then." "I gotchu."

9

J: "Just promise me when I am at work u won't' get hella pissed at me" "Panera and I work from 5 to 12:30" "And I get home around 1:15"

D: "You get home at 1:15 in the morning???" "My boy works at Panera." "Who do you live with in eg?"

Jane responded the next afternoon, February 27, 2020, with "Hey" After defendant replied, "Wassup," Jane sent several short videos of herself and her face. They contained no nudity. She wrote, "Yes, but not tmr" "It's okay baby I still like you" She sent more videos of her face. Their dialogue continued:

J: "Hehe we will do it together soo all the little [n-word] know you mine"

D: "You ain't said nothin I don't like yet"

J: [After sending an emoji] "But u gotta claim me too soooooo" "What did u think of the nudes?"

D: "They go brazy."

J: "Would u fuck?" "If u get with me I'm a freak" "For the first time I want it slow and romantic but the other times I want it to be rough" "Ya my pussy is hella tight I only fucked once and I just never did it again"

On the evening of February 28, 2020, defendant asked Jane how she slept. Jane replied she was "so tired" "Cuz of fuckin work I barely get any sleep" Their dialogue continued:

D: "What time do you get off?"

J: "1:15 is when I get home I get off at 12:30" "But from school I get off at 3" "I don't have work today so I'm happy"

D: "What times does Panera close???"

J: "Like 10 [symbol] but I have to clean up" "Not rn"

D: "Lemme see wassup with later."

J: "ok"

D: "It just be weird you only snap me in class"

10

J: "Sorry"

D: "Lemme call after school" "Get my video chat on" "I want I want"

J: "really baby?" "Sorry baby at least I come back I mean" "I could just bounce"

Their messaging resumed on March 2, 2020, as follows:

J: "Hey sorry I'll explain" "So my mom got mad cuz I came home late on Saturday but I was with my brothers and I smelled like tree and shit but I didn't smoke and my mom took my phone I got hella pissed and left and then came back but that shit had me fucked up because I'm damn near grown and she wanted to take my shit"

D: "Well it's because she's hispanic" "Hispanic moms are like that" "Especially with daughters"

J: "I wish she wasn't"

D: "Well she probably loves you. And just shows it in her own way." "Your young." "Your still her baby so she's gonna be protective" "Plus your pretty and she knows what it used to be like being young and pretty. ."

Later that evening, they continued messaging each other, in relevant part:

D: "Just be real dont hide it."

J: "I don't no one wants me because I'm 'mean' when in reality I'm living a life that ain't mine" "Ion belong a gang member and all this" "I have dreams but ppl tie me down" "And get mad when I go chase them"

D: "You gotta do good yourself other wise you cant do someone any good." "I guess I just gotta pull up one time and just chop it up" "See where your heads at." "See if we cant help each others situation out." "Because it sounds like your trying to succeed."

J: "I am but a lot of shit holds me back"

D: "And your circumstances seem to slow you down." "Like what"

J: "My mom and my family just want me to follow there footsteps ' carry the gun and smoke this and sell this ' I don't wanna do that and ion wanna have my children to

11

have to see shit I seen my brother got shot in front of me when I was 3 yrs old and I never ever forgave anyone for that even tho it wasn't there fault"

D: "Shittttttttt." "Ha I wish you knew my life." "I mean at the end of the day their throwing you a huge opportunity" "You could really be making huge moves in your life."

The next day, March 3, 2020, Jane messaged that defendant could pick her up from school, but she had to be home by 4:00. Their dialogue continued:

D: "And shake her hand and say nice to meet you?"

J: "No just be normal and just take me home" "Baby remember I'm a freak so when I see u I want u to be comfortable because I might wanna be in there"

D: "Wait what" "Like be in there in there?"

J: "I wanna show u how freaky I am"

D: "In 45 minutes??"

J: "YaI'll make it work" "Ya babe wait" "And [you]'ll see baby"

D: "You gotta communicate better with me." "Cause once you leave school. I dont hear from you"

J: "Honestly baby if u see me I'm sort of a sex Addict" "And ya baby I'm sorry for real"

D: "Well how have you only fucked one time" "But you're a sex addict" "How do you know you only wanna fuck me and be in a whole ass relationship. Being hella faithful to only one person. Like doesn't fucking one dick sound boring?"

J: "I mean if u don't wanna be with me it's ok I'm not gonna waist ur time but I mean I'm good with just fucking one dick" "But u sound not interested so" "I'll just go"

D: "It's not that I'm uninterested" "This is just a big decision and I just wanna be sure you wanna make it." "I dont take relationships lightly." "I never get in them. So when I do like its serious." "Ya know?" "Or is that just me?"

J: "I wanna be with u if I didn't I wouldn't waist my time witchu rn"

12

D: "Which panera do you work at?"

J: "The one in Davis"

Jane also messaged that night: "5'2" "But I'm chubby" "I'm Mexican tho sooooo" She further typed, "I am in love pa" "Witchu" Defendant asked "Whyyyyy," and she replied, "I don't know u are just amazing"

The following evening, March 4, 2020, defendant wrote to Jane, "Go to the bathroom and send me a video sayin yea it's me I cant wait to see you or whatever you want." "And my other question is do you got your ID on you?" Jane responded, "Ok ya gimmie a second I just went to the bathroom so I'll show u in a bit" Later that evening, when defendant asked if he could pick her up the next day, she said to pick her up because she was "already going" Defendant asked, "Already going where" and Jane responded, "Pleasant grove high school at 3"

Defendant and Jane next messaged each other on March 6, 2020. Jane indicated she was leaving. Their dialogue went as follows:

J: "Hey" "I'm going tonight ya"

D: "You didn't feel like letting me know?" "Great communication babe." "Are you done with school?" "And where at in LA?" "Can I swoop?"

J: "Ya u can"

D: "Are you done with you[r] school? And are you gonna be able to respond all the time?"

J: "Ya I will be and naw" A few hours later, Jane messaged, "Not live just stay for a while"

Early the next morning, March 7, the two continued messaging each other as follows:

D: "Can you leave the house and come back?" "I wanna see you play with that pussy" "And spread your legs and take a pics busting it open from the front" "With your face in it too"

13

J: "kk"

D: "Yes and then finger yourself and suck on your fingers lickin your pussy juice." "Mmmmm mami"

J: "damn baby"

Later that day, Jane messaged defendant that she had been at juvenile hall for six months. Defendant replied that he went to prison for two years.

The two had a long exchange in the early morning hours of March 11, 2020. It went as follows:

J: "I'm in Natomas"

D: "Shit ite." "I'm in rocklin rn"

J: "What time[?]" "Oh damn nvm u too far"

D: "You playin." "You be playin"

J: "Just let's link tmr" "Whatever have fun"

D: "Smh." "Tf" "You be hittiin any [n-word] up rn"

J: "No

D: "Omm"

J: "What the fuck where is this coming from" "And I put that on everything dude u need to chill tf out"

D: "You ain't hit me in the last few days much at all" "And then you wanna chill" "I say I'm on my way and then you like 'whatever have fun.'

J: "Because we don't have a nice ass convo baby u don't be saying nothing but 'lemme see ur pussy' and 'u playin' like fuck that shit and check urself don't ever talk to me like that ever"

D: "Are you serious??????" "And that you wanted to do shit to me in the whip" "And I wasn't even trippin on it" "Kept telling me your a freak"

J: "Ok but that's not all I talk [symbol] I'm dun talking about all this just u do u" "Honestly I'm not about to argue because it's just a waste"

14

D: "And then I ask to see some pussy when you sending nudes to me fresh out the shower" "And now I talk to you some type of way?" "Yeah check it out." "I'm grown. Noone dictates my life." "Other than the D.A" "I treat you with a lot of respect" "And I try to communicate with you often about all aspects of life." "You used to wanna talk hella all the time about your family and your future" "And now you keep it short which is whatever but don't flash on me"

J: "I just sometimes feel like this is all fake I feel like if I shake my head it will all go away and I am not supposed to feel like that I have feelings for u but the emotions from ex's and getting hurt build up and I can't take it ok" "I'm sorry I'm a fuck up" "I've always been that way" "But its hard ok"

D: "I understand." "Just work with me." You cant change the past we can only change the future."

Late on March 14, 2020, defendant and Jane engaged in the following dialogue:

D: "Why you put me on silent treatment???"

J: "I'm sorry I am just going through so much and don't really wanna talk about it"

D: "Can I grab you?"

J: "Tmr ya"

D: "What time" "And where"

J: "Around 2 and from my sisters house"

D: "Okay addy." "And what time u need to be back?" Jane did not respond.

On March 24, 2020, Jane wrote, "Whatever" Defendant responded, "Lmao tf" "Ur crazy" "All I do is say what's up and you say whatever"

The next morning, March 25, Jane wrote, "Hey" Defendant said, "Wassup" About two and half hours later, Jane wrote, "Cuz then u will probably be a jerk" "Cuz I just don't wanna say shit ion mean and end up hurting ur feelings I'f u get drunk" Defendant replied, "Why tf."

15

The remainder of the exchanges were insignificant. On April 19, 2020, defendant sent Jane an indecipherable photograph or screenshot. On April 20, he sent her two blank messages. On April 21, he sent her an empty attachment.

Judgment

A jury found defendant guilty on three counts of committing lewd acts on a child of 14 or 15 years by a person who is at least 10 years older than the child (counts 1, 2, and 3), one count of luring (count 5), and one count of possessing heroin (count 6). (§§ 288, subd. (c)(1); 288.3, subd. (a); Health & Saf. Code, § 11350, subd. (a).) The jury found defendant not guilty of one count of possessing child pornography (count 4). (§ 311.11, subd. (a).)

The trial court sentenced defendant to a prison term of four years, eight months, calculated as follows: the upper term of three years on count 1, a consecutive eight months each on counts 2 and 3, a consecutive four months on count 5, and a concurrent 90 days on count 6. The court found that section 654 did not apply to counts 2, 3, 5, and 6.

## DISCUSSION

### I

### *Knowledge of Jane's Minority*

Section 288.3, subdivision (a) prohibits communicating with a minor with the intent to commit an enumerated sexual offense, including section 288, subdivision (c)(1) which prohibits lewd or lascivious acts upon a child 14 or 15 years old. To prove a violation of this statute, a prosecutor must establish, among other elements, that the defendant knew or reasonably should have known the victim was a minor. (§ 288.3, subd. (a); *San Nicolas v. Harris* (2016) 7 Cal.App.5th 41, 46.)

16

Defendant contends substantial evidence does not support the jury's finding that he knew or reasonably should have known that Jane was a minor when he communicated with her between February 24 and April 26, 2020, as charged in the information. He argues the photos and videos Jane sent him on Snapchat of her face, breasts, and vagina are not substantial evidence that he knew or should have known Jane was under 18. He claims his acquittal of possessing child pornography, a crime which requires the defendant to know the person depicted is a minor, shows that the jury found he did not know Jane was under 18 based on her facial appearance and physical development as depicted in the Snapchat photos and videos.

Defendant argues the Snapchat messages also do not establish that he knew or should have known Jane was under 18. In those statements, Jane lied about her age, her schooling, her employment, and her plans. She portrayed herself as sexually active beyond someone of her real age. She even posed as an adult to open an account on Bumble, where she contacted defendant.

Further, defendant claims the phone calls and messages between his phone and Alice's phone on April 25 and 26, 2020, are not substantial evidence. Jane portrayed herself in those calls and messages as an adult. Defendant argues the additional calls and texts sent by Jane's family after Jane left Alice's house are irrelevant because they occurred after Jane was with defendant.

In evaluating defendant's claim, " 'we review the whole record to determine whether any rational trier of fact could have found the essential elements of the crime . . . beyond a reasonable doubt. [Citation.] The record must disclose substantial evidence to support the verdict—i.e., evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the jury could reasonably have deduced from the evidence. [Citation.] "Conflicts and even

17

testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict. [Citation.]' (*People v. Zamudio* (2008) 43 Cal.4th 327, 357.)" (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

We conclude substantial evidence supports the jury's determination that defendant knew or should have known that Jane was under 18 years of age. The jury could have reasonably reached this conclusion from viewing the photos Jane sent of herself to defendant. The photos depict the face of a young teenage girl. Although Jane's body may have been developed, it was reasonable for the jury to conclude that her face is not that of an 18-year-old adult.

Defendant argues that the jury's finding him not guilty of possessing child pornography demonstrates the jury found he did not know from the photos that Jane was under 18. We disagree. It has long been the law that an acquittal of one or more counts charged in an accusatory pleading "shall not be deemed . . . an acquittal of any other count." (§ 954; *People v. Amick* (1942) 20 Cal.2d 247, 251-252.) The jury was required to consider each count separately and return a separate verdict for each, and the trial court so instructed the jury. (CALCRIM No. 3515.) We presume the jury followed the instruction. (*People v. Winbush* (2017) 2 Cal.5th 402, 457-458.)

Even if the jury's acquittal of the child pornography charge could be considered, it was not relevant to the luring charge. To prove possession of child pornography, the prosecutor had to establish defendant knew that the offending matter depicted a person under the age of 18. (§ 311.11, subd. (a); 311.2, subd. (g); CALCRIM No. 1141.) In acquitting defendant of possessing child pornography, the jury was not asked to consider

18

whether defendant *should have known* that Jane was under 18, the element of the luring charge. The acquittal thus has no bearing on the jury's findings on the luring charge, and the photos of Jane were substantial evidence from which the jury could reasonably conclude defendant should have known that Jane was under 18.

Additional evidence exists in the record from which the jury could reasonably conclude defendant knew or should have known that Jane was under 18. When detectives interviewed defendant on the day of his arrest, and after defendant learned Jane was not 18 and the police were there to investigate a molestation, defendant stated, "I didn't know that she was not 18. I would not have brought her to my house, bro. I get plenty of bitches. I'm not worried about no fuckin' 14-year-old girl, understand that." Defendant made this reference to a 14-year-old before the detectives told him Jane's true age. The jury could reasonably infer that defendant made the comment in reference to Jane whom he knew was 14 years old.

Defendant was charged with luring Jane up to and including April 26, 2020, and he received several text and voice mail messages on his phone from Jane's family on April 26, 2020, informing him that Jane was a minor. Jane's father Stephan sent text messages stating Jane was 14 years old and referring to Jane as "kiddo." Stephan's sister Stacey left numerous voicemails that day on defendant's cell phone stating Jane was 14 and was underage. The jury could have reasonably concluded that defendant knew or should have known from these messages on April 26 that Jane was under 18, but despite that knowledge defendant continued to lure Jane with the intent of committing sexual acts with her on April 27 and 28, as the information charged.

Several Snapchat messages between defendant and Jane could have reasonably led the jury to believe that even defendant was not convinced Jane was 18 and that he should have known she was underage. In one message, Jane said her mother got mad at her and took her phone. That angered Jane "because I'm damn near grown" and her mother wanted to take her things. Defendant explained Jane's mother's actions in part by saying

19

to Jane, "Your young." "Your still her baby so she's gonna be protective." The jury could reasonably infer from Jane's and defendant's comments that defendant knew or should have known that Jane was a minor. She was "near grown" and "young."

On March 4, 2020, defendant specifically asked Jane if she had her "ID" on her. Jane said she would show him in a bit, but there is no evidence she sent any kind of identification to defendant via Snapchat. The jury could reasonably infer from defendant's comment that he knew or should have known Jane was a minor. Otherwise, he would not have asked for her identification.

Despite Jane's lies to make defendant think she was 18, she told defendant she was in high school. While 18-year-olds obviously attend high school, defendant said it was weird she sent Snapchat messages with him only while in class, and he asked if he could call after school, get his "video chat on," and "I want I want." Jane did not address his request. Instead, she said, "really baby?" "Sorry baby at least I come back I mean." "I could just bounce" Days later, Jane asked defendant to pick her up at school, but she had to be home by 4:00. Defendant again commented that once she left school, he did not hear from her, and he wanted her to communicate better with him. The jury could reasonably infer from these comments that defendant recognized or should have recognized that Jane was a minor due to her inability to contact him after school.

In his brief, defendant emphasizes the Snapchat messages from which he reasonably could conclude that Jane was 18. We do not disagree that Jane sent a significant number of messages intending to convey she was an adult. But we do not resolve evidentiary conflicts. We look only for substantial evidence to support the jury's finding, and having found it, we must affirm the jury's determination that defendant knew or should have known that Jane was under the age of 18 when he lured her to his home to engage in lewd acts. (*People v. Manibusan, supra*, 58 Cal.4th at p. 87.)

20

## II

### *Ineffective Assistance of Counsel*

Defendant contends his attorney rendered ineffective assistance by not requesting a pinpoint jury instruction on his mistake of fact defense to the luring count. He argues that substantial evidence supported his affirmative defense that he actually believed Jane was 18 years old. Counsel thus had a duty to request an instruction on the mistake of fact defense, but he did not make the request, and there is no satisfactory reason why he did not make the request. Defendant contends the error was prejudicial because without the instruction, the jury had no opportunity to decide whether defendant believed Jane was 18.

### A.     Background

The trial court ruled in limine and during the parties' discussions about jury instructions that defendant could raise actual mistake of fact as a defense to the luring count. The court instructed the jury on the luring count with CALCRIM No. 1124. The instruction informed the jury that to find defendant guilty, the People had to prove:

"1. The defendant contacted or communicated with a minor;

"2. When the defendant did so, he intended to commit a lewd or lascivious act on a child 14 or 15 years of age in violation of Penal Code section 288(c)(1) involving that minor;

"AND

"3. The defendant knew or reasonably should have known that the person was a minor.

"A *minor* is a person under the age of 18."

Defense counsel did not request the trial court to instruct the jury with the mistake of fact instruction, CALCRIM No. 3046.

B.    Analysis

A trial court does not have a duty to instruct sua sponte on a defense such as mistake of fact that merely negates an element of the crime if the jury received complete and accurate instructions on the element. (*People v. Covarrubias* (2016) 1 Cal.5th 838, 873-874.)  It is defense counsel who has a duty to request " 'all instructions which in his judgment are necessary to explain all of the legal theories upon which his defense rests.' [Citations.]" (*People v. Hussain* (2014) 231 Cal.App.4th 261, 270.)

To establish ineffective assistance of counsel, defendant must prove that (1) counsel's performance in not requesting an instruction on the mistake of fact defense fell below an objective standard of reasonableness under prevailing professional norms, and (2) the deficient performance prejudiced defendant. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688.)

"On direct appeal, a finding of deficient performance is warranted where '(1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation.' (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)  '[W]here counsel's trial tactics or strategic reasons for challenged decisions do not appear on the record, we will not find ineffective assistance of counsel on appeal unless there could be no conceivable reason for counsel's acts or omissions.' (*People v. Weaver* (2001) 26 Cal.4th 876, 926.)" (*People v. Johnsen* (2021) 10 Cal.5th 1116, 1165.)

Defendant admits the record does not indicate why counsel did not request the mistake of fact instruction.  He contends we must nonetheless find that counsel rendered ineffective assistance because there was sufficient evidence to justify giving the mistake of fact instruction and there can be no satisfactory or conceivable reason why counsel did not request it.

22

We disagree. It is conceivable that counsel did not request the instruction because the instruction the court gave, CALCRIM No. 1124, correctly and completely instructed on the knowledge element and provided the jury an opportunity to determine whether defendant knew or should have known that Jane was under 18. A mistake of fact instruction was not necessary to put that issue before the jury. (See *People v. Covarrubias, supra*, 1 Cal.5th at pp. 873-874 [defense that operates only to negate mental element of a crime is not a special defense and court does not have duty to instruct on the defense sua sponte].)

It is also conceivable that counsel did not request a mistake of fact instruction because he believed defendant was not entitled to the instruction, the trial court's earlier rulings notwithstanding. It is not clear that defendant was entitled to a mistake of fact instruction on the luring count. "[A] mistake of fact jury instruction is not appropriate where the defendant's mistaken belief does not negate an element of the crime." (*People v. Givan* (2015) 233 Cal.App.4th 335, 345.) Defendant's actual belief that Jane was 18 years old does not necessarily negate the luring statute's knowledge element. Defendant is guilty of luring if he should have known Jane was under 18 despite his mistaken actual belief.

Defendant directs us to no authority for the proposition that a mistake of fact defense lies against the luring statute's objective knowledge element. (§ 288.3, subd. (a).) His reliance on *People v. Speck* (2022) 74 Cal.App.5th 784, *and People v. Hanna* (2013) 218 Cal.App.4th 455 is misplaced. In *Speck*, a panel of this court determined the trial court erred when it denied defense counsel's request to instruct on mistake of fact as a defense to charges of felony vehicle theft and receiving stolen property and that the error was prejudicial. (*Speck*, at pp. 791-795.) In *Hanna*, another panel of this court determined the trial court erred when it denied defense counsel's request to instruct on mistake of fact as a defense to a charge of attempted lewd conduct with a child under the age of 14 years but that the error was not prejudicial. (*Hanna*, at pp. 460-463.) Neither

case concerned ineffective assistance and whether defense counsel had no conceivable reason for not requesting the mistake of fact instruction, nor did either case concern a crime with an objective knowledge element.

Because the record does not indicate why counsel did not request a mistake of fact instruction and because rational reasons for counsel's omission are not inconceivable, we conclude defendant has not established that counsel rendered deficient performance and ineffective assistance.

## III

### *Exclusion of Evidence*

Defendant contends the trial court erred in not admitting into evidence Snapchat messages between defendant and other persons on the ground of hearsay where defendant asked the other persons their ages and in writing ended the conversations or did not respond upon learning the other persons were minors. Defendant argues the evidence was not hearsay because it was not offered to prove the truth of the matters stated. It was offered to establish defendant's state of mind and his habitual reaction upon learning the persons were minors. Defendant asserts the error was a prejudicial abuse of discretion and it denied him his constitutional rights to due process, a fair trial, and to present a defense.

### A.   Background

During trial and outside the presence of the jury, the prosecutor informed the court that defense counsel that morning gave her copies of some Snapchat messages between defendant and other unknown people which defense counsel intended to introduce as part of his case. The prosecutor objected, arguing the messages were hearsay statements which did not qualify under any hearsay exception.

Defense counsel stated the messages were found by a defense data extraction expert who would be testifying. The messages were between defendant and other

24

persons who claimed to be minors. In the messages, defendant asked the persons their ages and, upon learning they were minors, discontinued speaking with them or told them he could not hang out with them. Counsel argued the messages showed defendant did not exhibit a pattern of criminality.

Defense counsel also argued the messages were relevant because they would relate to the testimony from another defense expert witness, a licensed psychologist. The psychologist would testify that defendant as a young child had been diagnosed with attention deficit hyperactivity disorder (ADHD), and that people with ADHD have a difficult time remembering things or completing tasks and are easily distracted. Defense counsel wanted to argue that because defendant had ADHD, he may not have followed through with his request to Jane to show her identification because he may have believed he had already verified Jane's age, something the new Snapchat messages showed he did "on a regular basis[.]"

The court confirmed with defense counsel that the messages were not being offered for the truth of whether the other persons were actually minors but were being offered to show defendant's state of mind related to minors. Counsel confirmed the court was correct.

The prosecutor argued that although it appeared the evidence would come in to show defendant's state of mind, it would still be used for the truth to show that defendant in fact rebuffed advances from minors. The court stated the evidence was not hearsay as to the other persons, but it asked defense counsel whether the evidence was hearsay as to defendant. Counsel stated the evidence was hearsay in that it consisted of out-of-court statements, but it was admissible through a hearsay exception to show defendant's state of mind.

The trial court questioned counsel's argument, stating, "But that can always be the case. In a murder case and some defendant says I didn't do it, that's state of mind. He

25

doesn't believe he did it, but it wouldn't come in." The court took the matter under submission.

Ultimately, the court ruled it would not admit the new Snapchat evidence. It reasoned the evidence was "inadmissible hearsay as to the defendant. [¶] If he were on the stand, for example, and you wanted to bring this in and there was an objection from the People saying, well, Your Honor, we object because the statement from the girl or the other person is hearsay, then it might come in on a state of mind; right? But if the defendant's not on the stand, his statement would be coming in without an exception to the hearsay rule. It wouldn't come in under [Evidence Code section] 1220 because it's not being used against him. And that's my ruling."

B.     Analysis

The Attorney General initially contends defendant has forfeited his argument that the Snapchat messages were admissible to show he had a habit of verifying ages because at trial defendant did not assert habit as a ground to admit the evidence. We disagree. Defense counsel argued the messages were relevant because they attested to defendant regularly verifying the ages of the people he communicated with on Snapchat. Arguing for the admission of this evidence of regular behavior is sufficient to preserve on appeal the right to argue whether the evidence should be admitted as evidence of habit under Evidence Code section 1105. "[A] habit involves a consistent, semiautomatic response to a repeated situation." (*Bowen v. Ryan* (2008) 163 Cal.App.4th 916, 926.)

The primary issue before us, however, is whether the evidence was inadmissible hearsay. Evidence of habit is not admissible if the evidence is hearsay not subject to a hearsay exception. (Evid. Code, § 1105.) Defendant argues the evidence was not hearsay because it was not offered to prove the truth of the matter stated. Rather, it was offered to show defendant's state of mind upon reading the responses to his questions and his reaction to those responses.

26

We review the trial court's evidentiary ruling for an abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 725.) Generally, evidence of a declarant's out-of-court statement " ' " 'offered to prove that the statement imparted certain information to the hearer and that the hearer, believing such information to be true, acted in conformity with that belief . . . is not hearsay, since it is the hearer's reaction to the statement that is the relevant fact sought to be proved, not the truth of the matter asserted in the statement.' " ' [Citation.]" (*People v. Bell* (2019) 7 Cal.5th 70, 100; Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 4th ed. 2022) § 1.34.)

Under this rule, the other persons' responses to defendant's questions about their ages are not hearsay to the extent they are offered to show that defendant acted in accordance with believing the statements were true. But in this instance, defendant acted as an out-of-court declarant himself when, after learning the other persons were minors, he stated he could not hang out with them.

Defendant contends his responses to the other individuals were offered to demonstrate his state of mind, not the truth of the matters he stated, and that he had a habit of verifying the ages of his Snapchat contacts. We disagree. His responses to the contacts were hearsay which were relevant only if they were introduced for the truth of the matter stated. His responses showed defendant did not hang out with minors on Snapchat only if they were admitted for their truth. Defendant's state of mind in writing those responses or the fact that he wrote those words were irrelevant. Defendant offered no exception to the hearsay rule under which the court could have admitted the evidence, and habit itself is not a hearsay exception. The trial court did not abuse its discretion in not admitting the evidence.

Even if the trial court erred in not admitting the evidence, the error was not prejudicial under the state or federal standards for demonstrating prejudice. (*People v. Watson* (1956) 46 Cal.2d 818, 836; *Chapman v. California* (1967) 386 U.S. 18, 24.) The error was harmless beyond a reasonable doubt because had the jury been made aware of

defendant's habit, it still would have concluded defendant should have known Jane was under 18. It was reasonable for the jury to conclude that Jane's photograph alone should have led defendant to know that she was under 18. Speaking with police, defendant made a derogative comment about not worrying about a 14-year-old girl before police informed him of Jane's age, suggesting he already knew Jane was 14. And on the day Jane arrived at defendant's house and before all the lewd acts had been performed, defendant's phone received hundreds of voice mails and text messages from Jane's relatives, many of which informed him Jane was underage.

Moreover, even if defendant did not follow up on his request to see Jane's identification, Jane testified that when she and defendant first met, he asked her for her age. She told him she was 18. Defendant made the request, habit or not, and the jury still concluded defendant should have known she was 18 under the all the evidence presented at trial.

Also if there was error, the error did not deprive defendant of his constitutional right to present a defense. Excluding evidence related to a possible habit of checking ages did not deny defendant the right and ability to present his mistake of fact defense. (See *People v. Hawthorne* (1992) 4 Cal.4th 43, 58 [no denial of due process where exculpatory value of excluded evidence was tangential at best].)

IV

*Cumulative Error*

Defendant contends that the trial court's series of errors cumulatively resulted in a denial of due process as to the luring count. "Under the cumulative error doctrine, the reviewing court must 'review each allegation and assess the cumulative effect of any errors to see if it is reasonably probable the jury would have reached a result more favorable to defendant in their absence.' [Citation.]" (*People v. Williams* (2009) 170 Cal.App.4th 587, 646.) Where there are no errors to cumulate, we must reject

defendant's cumulative error argument. (*People v. Ramirez* (2022) 79 Cal.App.5th 48, 63; review granted Oct. 12, 2022, S275341.)

V

*Sentencing Remand*

Defendant contends that recent amendments to the state's sentencing laws apply retroactively to him, and he asks us to remand for resentencing. The Attorney General agrees with defendant, as do we.

Effective January 1, 2022, a trial court must impose a lower term sentence if the defendant was under 26 years of age when he committed the offense unless the court finds that aggravating circumstances outweigh mitigating circumstances that imposition of the lower term would be contrary to the interests of justice. (§§ 1170, subd. (b)(6); 1016.7, subd. (b) [Stats. 2021, ch. 731 (Sen. Bill No. 567), § 1.3; Stats. 2021, ch. 695 (Assem. Bill No. 124), § 4].)

Also effective January 1, 2022, a trial court may not impose an upper term sentence except where there are circumstances in aggravation that justify imposing the upper term, and the facts underlying those circumstances were stipulated by the defendant or were found true beyond a reasonable doubt by the trier of fact. (§ 1170, subd. (b)(1), (2) [Stats. 2021, ch. 731 (Sen. Bill No. 567), § 1.3].) The court, however, may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury. (§ 1170, subd. (b)(3).)

Both measures apply retroactively to nonfinal cases on direct appeal. (*People v. Zabelle* (2022) 80 Cal.App.5th 1098, 1108-1109 [Sen. Bill No. 567]; *People v. Banner* (2022) 77 Cal.App.5th 226, 240 [Assem. Bill No. 124].) Both measures apply here. Defendant was 24 years old when he committed the offenses. He thus is entitled to a

29

resentencing hearing for the trial court to determine under section 1170, subdivision (b) whether imposing the lower term on count 1 would be contrary to the interests of justice.

Defendant was also sentenced to the upper term on count 1. The trial court found as circumstances in aggravation that the crime involved a high degree of callousness, the victim was particularly vulnerable, the manner in which the crime was carried out indicated planning, defendant's past violent conduct indicated he was a serious danger to society, his prior convictions as an adult were numerous, he was on parole when he committed the crime, and his prior performance on probation and parole had been unsatisfactory.

There is no evidence in the record, however, that the court's findings in aggravation were found true by the jury beyond a reasonable doubt or that defendant stipulated to them. There is also no evidence that the court's consideration of defendant's prior convictions was based on a certified record of those convictions. Defendant is thus entitled to a resentencing hearing for the trial court to determine whether to impose the upper term in compliance with section 1170, subdivision (b) as amended effective January 1, 2022. We will so order on remand.

VI

*Section 654*

Defendant contends the trial court erred under section 654 by imposing separate sentences for count 1, lewd act on a minor on or about April 27, 2020, and count 5, luring between February 24 and April 26, 2020. He argues that both counts arose from the same course of conduct and must be stayed under section 654. He also claims that remand is appropriate for the trial court to determine whether count 1 or count 5 should be stayed in accordance with Assembly Bill No. 518 (Stats. 2021, ch. 441, § 1), which amended section 654 effective January 1, 2022.

Whether section 654 applies "is a question of fact for the trial court, which is vested with broad latitude in making its determination. [Citations.] Its findings will not be reversed on appeal if there is any substantial evidence to support them. [Citations.] We review the trial court's determination in the light most favorable to the respondent and presume the existence of every fact the trial court could reasonably deduce from the evidence." (*People v. Jones* (2002) 103 Cal.App.4th 1139, 1143.)

At the time of defendant's sentencing, section 654 provided that "[a]n act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision." (Former § 654, subd. (a) [Stats. 1997, ch. 410, § 1].) Effective January 1, 2022, the statute now states that such an act "may be punished under either of such provisions," but in no case under more than one provision. (§ 654, subd. (a) [Stats. 2021, ch. 441 (Assem. Bill No. 518), § 1].)

Section 654's reference to an "act or omission" may include both a discreet physical act and a course of conduct encompassing several acts pursued with the same objective. (*People v. Corpening* (2016) 2 Cal.5th 307, 311.) Courts thus apply a two-step inquiry to determine whether section 654 bars multiple punishments. First, if the defendant completed the crimes by a " 'single physical act,' " he may not be punished more than once for that act. (*Ibid.*) Second, if the case involves more than a single act—i.e., a course of conduct—courts "consider whether that course of conduct reflects a single 'intent and objective' or multiple intents and objectives." (*Ibid.*)

The parties do not dispute the trial court's finding on step one that counts 1 and 5 involved more than a single physical act. We thus turn to step two to determine whether substantial evidence supports the trial court's finding that counts 1 and 5 involved a course of conduct that reflected multiple intents and objectives.

31

" 'Whether a course of criminal conduct is divisible and therefore gives rise to more than one act within the meaning of section 654 depends on the *intent and objective* of the actor. If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Latimer* (1993) 5 Cal.4th 1203, 1208, quoting *Neal v. State of California* (1960) 55 Cal.2d 11, 19.)

"Importantly, under section 654 'a course of conduct divisible in time, although directed to one objective, may give rise to multiple violations and punishment.' (*People v. Beamon* (1973) 8 Cal.3d 625, 639, fn. 11 [].) Therefore, '[i]f the offenses were committed on different occasions, they may be punished separately.' (*People v. Kwok* (1998) 63 Cal.App.4th 1236, 1253 [].) 'This is particularly so where the offenses are temporally separated in such a way as to afford the defendant opportunity to reflect and to renew his or her intent before committing the next one, thereby aggravating the violation of public security or policy already undertaken.' (*People v. Gaio* (2000) 81 Cal.App.4th 919, 935 []).)

"In cases involving sex offenses, '[e]ven where the defendant has but one objective—sexual gratification—section 654 will not apply unless the crimes were either incidental to or the means by which another crime was accomplished. [Citations.] [¶] [S]ection 654 does not apply to sexual misconduct that is "preparatory" in the general sense that it is designed to sexually arouse the perpetrator or the victim.' (*People v. Alvarez* (2009) 178 Cal.App.4th 999, 1006 []).)" (*People v. Jacobo* (2019) 37 Cal.App.5th 32, 53.)

Substantial evidence supports the trial court's determination that section 654 did not apply to the sentences for counts 1 and 5. The luring occurred from February 23 to April 26, 2020, and the molestation charged in count 1 occurred on April 27, 2020. Even though the luring facilitated the lewd acts, the offenses were committed at different times,

and defendant had a sufficient opportunity to reflect and form a new intent, or renew his intent, before he molested Jane.

Defendant relies on *People v. Medelez* (2016) 2 Cal.App.5th 659 (*Medelez*) to contend he harbored a single intent for both crimes and that the luring was merely incidental to, and directly facilitated, the molestation in count 1. *Medelez* is distinguishable on its facts. In that case, the defendant drove a minor to a remote place and offered the minor money in exchange for oral sex. When the minor refused, the defendant told the minor to take off his pants. The minor complied because he was afraid. The defendant showed the minor pornographic pictures and " 'was about to lean in' " when the minor pulled up his pants and stopped the defendant. (*Id*. at p. 662.) The jury found the defendant guilty of luring with the intent to engage in oral sex and attempted oral copulation with a minor. (§§ 288.3, subd. (a); 664; former § 288a, subd. (b)(1).) The trial court imposed separate sentences for the crimes. (*Medelez* at p. 661.) The court of appeal reversed. It ruled that the defendant could not be punished for both attempted oral copulation and luring "because the crimes were based on a single intent and objective, as the People concede." (*Id*. at p. 663.)

In *Medelez*, the crimes immediately followed one after the other in time. The luring truly was incidental to the attempt, and the crimes were not temporally separated in such a way as to afford the defendant the opportunity to reflect and to change or renew his intent. Here, sufficient evidence existed for the trial court to determine that defendant had a sufficient opportunity to reflect and renew his intent to commit lewd acts between the luring and the molestation.

## DISPOSITION

The judgment is reversed and the matter remanded solely for resentencing under section 1170, subdivision (b) as that statute was effective January 1, 2022. In all other respects, the judgment is affirmed.

 

_____
HULL, Acting P. J.

We concur:

_____
RENNER, J.

_____
McADAM, J.*

_____

\* Judge of the Yolo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

34